GEORGE W. CLARKE *v.* PUIG BROTHERS.—ON A RE-HEARING.

The principal ought to reimburse the expenses and charges which the agent has incurred in the execution of the mandate, and pay his commission where one has been stipulated.

If there be no fault imputable to the agent, the principal cannot dispense with this reimbursement and payment, even if the affair has not succeeded ; nor can he reduce the amount of reimbursement, under pretence that the charges and expenses ought to have been less.

APPEAL from the Third District Court of New Orleans, *Fellowes*, J. *George L. Bright, for plaintiff.*—The answer admits the contract, and alleges :

1. That the cargo of the Belle Bernard was sold to T. C. A. Dexter, but he failing to comply, the cargo was sold again, and gave a nett difference of $10,179 73, as is shown by the account of the re-sale filed, and the plaintiff agreed that the said difference should be carried to his debit in his general account.

2. That the said general account was furnished to plaintiff, whereby a balance of $209 23 is shown to be due to defendants.

3. That the defendants claimed and charged exchange in their accounts at the rate prevailing in the market at the time the funds realized under the contract had come to hand, whereas the plaintiff contended that the claim should be made at the rate of exchange existing at the time of shipment; and the plaintiff contended that the excess of gold deposited for duties in the Custom-House should be returned to him; and the defendants claimed that the gold deposited by them formed a part of the charges they had to pay for plaintiff. And these two points of difference being the only matters of difference between the plaintiff and defendants, a compromise was proposed and accepted, and they were submitted to arbitration, and the arbitrators decided in favor of defendants.

They pray that plaintiff's petition be dismissed, and for judgment for $209 23.

We admit, on the part of plaintiff, that the Dexter loss of $10,179 73 should be charged to him.

The answer admits the contract, and the only questions before the Court are :

1. Is the award of the arbitrators binding on the plaintiff ?

2. If it is not, should the defendants have charged the premium on gold, according to the rate ruling at the time they made the advances, or at the time they sold the molasses and realized the proceeds ?

3. What is the amount over-charged ?

I. It does not appear that either party appointed an arbitrator.

Mr. Peychaud, a witness, says : "I was appointed one of the arbitrators in this case."

It does not appear by whom he was appointed; but, subsequently, by a note addressed by plaintiff to Mr. Peychaud, it appears that Mr. E. J. Forstall was appointed umpire. The umpire rendered an award in favor of defendants.

The award is a nullity.

C. C. 3076 : There are two sorts of arbitrators—the arbitrators properly so called, and the amicable compounders.

C. C. 2078 : Before examining the difference to them submitted, the arbitrators ought to take an oath before a Judge, or Justice of the Peace, to render their award with integrity and impartiality in the cause which is laid before them.

C. C. 3080 : The arbitrators shall appoint a time and place for examining the matter to them submitted, and give notice thereof to the parties or their attorneys.

C. C. 3067 : The submission must be in writing.

It does not appear that any appointment was made by plaintiff, nor does it appear in writing that Peychaud was appointed ; it does not at all appear by whom he was appointed.

It does not appear that they were ever sworn, nor that they gave to the parties notice of the time and place for examining the matters to them submitted. It does not appear that any award of arbitrators was ever rendered.

It appears that Mr. E. J. Forstall rendered, as umpire, an award. It does not appear that he gave any notice of the time and place of examination to either party; and it does appear that he was never sworn.

In *Harrod et al.* v. *Lewis et al.* 3 Martin, 317, the Court said : In the Code there are many general rules laid down on this subject. Two important ones among them are these :

1. The power of the arbitrators does not extend to things which are not included in the compromise.

2. They ought to be sworn.     *     *     *     They ought to have been sworn. They have not been. The award was rejected.

In *Bethea* v. *Hood,* 9 An. 88, the Court said : Neither the submission nor the award make any mention of the arbitrators having been sworn; and two of these arbitrators being called by plaintiff as witnesses in the case, testify that they were not sworn. The want of this formality is fatal to the award.

In *Overton* v. *Independence Alpha,* 13 An. 558 : The arbitrators were not sworn. The award, therefore, cannot be enforced against the defendant.

II. Should the defendants have charged the premium on gold according to the rate ruling at the time they made the advances, or at the time they sold the molasses ?

We think, at the time they made the advances. The contract stipulates "that the proceeds of said molasses here, after deducting cost and charges, commissions, and all expenses paid thereon by Puig Bro., will be handed over," etc.

The question, then, is what was the cost ? It was what was paid for it: the gold price on the day of purchase, in legal tender notes. The cost is the amount for which plaintiff became indebted to defendant on the day of purchase. He could have discharged the debt on that day by reimbursing them the amount paid. The defendants could have reimbursed themselves the gold paid for plaintiff, by buying at the rate of premium. The defendants were not speculating in the adventure ; by the contract, they were not either to make or lose anything, under any circumstances, except their commissions, which they were to make, but not to lose. If they had a right to make on the advance of gold, it would have been their obligation to lose on its fall. They expressly provided against that, by the stipulation that they should deduct the cost out of the proceeds; the cost was the value of gold in legal tender on the day it was purchased. The cost is the price paid for it, and should have been, and probably was, charged against plaintiff on the day it was paid. The contract is, that the defendants, after deducting the costs paid, will hand over the balance

to plaintiff. They do not pretend that they paid the amount charged by them, but they claim the advantage to be derived from the advance of gold. At the time they made the contract, it is evident that they were not to be speculators in the adventure ; that the plaintiff alone was the speculator.

*Cyprien Dufour, for defendant and appellant.*—For a proper understanding of this case, the Court should at once be put in possession of the contract which has given rise to it. It is as follows :

"Puig Brothers agree to ship either in Matanzas or Cardenas (Cuba) for account of Mr. G. W. Clarke, one or two cargoes of molasses (Muscovado) not exceeding in all one hundred thousand gallons, or thereabout, covered by insurance effected by them. The respective bills of lading to be taken in their name, the shipment or shipments of said molasses shall come to their consignment, and the sales thereof shall be made by them on arrival in New Orleans for account of said Clarke.

Mr. G. W. Clarke agrees on his part to furnish and send out on his own account a vessel or vessels, with the number of empty barrels sufficient to receive in Cuba said molasses, and bring them to New Orleans. He further binds himself to deposit and make over into the hands of Puig Brothers all the empty barrels he will ship to that effect, they being his own property, free from all claim or encumbrance, as a guarantee to said Puig Brothers against loss that might result from said shipments.

It is fully understood and agreed that the proceeds of said molasses here, after deducting costs and charges, exchange, commissions, and all expenses paid thereon by Puig Brothers, will be handed over to A. W. Walker, and that whatever loss or deficit should result from the operation shall be made good, and refunded to Puig Brothers by G. W. Clarke. New Orleans, February 10th, 1864."

The controversy lies in the question of exchange, arising upon the account rendered by Puig Brothers, in pursuance of this contract. They claim exchange in their accounts at the rate prevailing at the time when the funds realized under the contract had come to hand ; whereas, the plaintiff contends that the claim should be made at the value of exchange as existing at the time the shipments were made.

The lower Court sustained the plaintiff's pretensions, and the defendants have appealed.

The theory upon which this judgment is constructed, is not explained by the District Judge. He says : "I cannot conceive upon what principle the plaintiff can be held liable for the premium of exchange, at the date of the settlement between him and the defendants." I could not say this is satisfactory. There are some legal principles of the highest order which should not be overlooked in the determination of this question.

24

The contract between the parties contemplates no payment until the sales are realized in New Orleans. A supposed payment at the time of shipment by Puig Brothers is sheer fancy, because the plaintiff never furnished funds, and the defendants did not promise to advance any.

The defendants are not the sellers of the goods shipped in Cuba; they are only the medium through which the goods were obtained.

Every order for the purchase of goods conveys in se modus operandi and the provision made for payment. In the present instance the price is to be paid out of the proceeds of the goods realized in New Orleans; and of course this money cannot be remitted at the place of purchase otherwise than at the rate of exchange then prevailing.

The fundamental rule of mercantile law is, that no usage of trade can be set up in contravention of an express contract. "When the intent of the parties is evident and lawful, neither equity nor usage can be resorted to in order to enlarge or restrain that intent." Article 1958, C. C.

"Le commissionnaire peut avoir à se rembourser par des modes différents : selon l'usage, à moins que les parties ne s'en soient autrement expliquées ; suivant la convention, quand elle a réglé le mode de remboursement." 2 Delamare et Le Poitvin, 494, No. 328. Droit Commercial; Contrat de Commission.

"Lorsque les contractants ont réglé d'avance le mode de remboursement cette convention fait partie intégrante de la forme du mandat, mandatum est indivisibile. Ditto p. 494, No. 328.

It was in obedience to this ruling principle that the eminent merchant, who acted as umpire in the arbitration of this case, rejected the plaintiff's claim. He says in his report : "The undersigned can see nothing in the contract to justify such claim, which he considers unfounded."

The time and mode of settlement are established in our contract. All costs and charges, exchange, commissions, and all expenses shall be paid out of the proceeds of the molasses to be sold by Puig Brothers. If all these things must be paid with the proceeds of the sales, surely the time of payment is clearly marked out. The intention is expressed with irresistible clearness that such payment will be effected after the sales. And as the debt is contracted in a foreign country, and as the payment must of course be in the currency of that country, provision is specially made that exchange will be included in the settlement.

There cannot be any serious difficulty about this matter when the contract contains so plain a provision for payment. If the 'adventure had been entered into by valuations upon the parties, or by funds, or credits remitted for that purpose, the operation would have been closed per appointment on the shipment of the goods.

If there had been a stipulation for advances, these should have been reimbursed with the interests, for interests are always chargeable upon advances.

But there are no such things in our contract. The plaintiff furnishes

George W. Clarke v. Puig Brothers.

no money and no credit; he is a speculator. The defendants make no advances, and call for no interests; they only agree to obtain goods for account of the plaintiff, on condition that they shall have the entire management of them. And the cost, charges, exchange and commission are to be paid from the proceeds of the sales. So situated, what are the relations of these parties ?

In law, they are principal and agent. The defendants are mandataries. As such, they are entitled to be protected from all necessary expenses and unavoidable losses.

The principal is bound to execute the engagements contracted by the attorney, conformably to the power confided to him. Article 2990 C. C.

The principal ought to reimburse the expenses and charges which the agent has incurred in the execution of the mandate, and pay his commission when one has been stipulated. Article 2991, C. C.

"Equity obliges the proprietor, whose business has been well managed, to comply with the engagements contracted by the manager in his name; to indemnify the manager in all the personal engagements he has contracted ; and to reimburse him all useful and necessary expenses." Article 2278. C. C.

"The general rule seems to be that the mandator is bound to indemnify the mandatory against all losses and injuries, the proximate cause of which can be directly traced to the execution of the mandate." Story on Bailments; § 200.

HOWELL, J. The plaintiff and defendants entered into an agreement, by which the latter were to furnish a quantity of molasses, in Cuba, and the former the means of transportation thereof to this port, to be sold by defendants for account of plaintiff, and " the proceeds here, after deducting the cost and charges, exchange, commissions, and all expenses paid thereon by Puig Brothers, to be handed over to G. W. Clarke," who is to refund to them any loss or deficit that may result from the operation.

The sole matter in controversy is the date at which the exchange should be charged—the plaintiff contending that he is to pay the rate current at the date of the shipments, and the defendants that he should pay the rate current when the proceeds of the adventure were realized.

In our former judgment we recognized the principle that the date of *actual payment* by defendants should govern, and ordered the case to be remanded to ascertain that date; but both parties applied for a re-hearing, on the ground that the rights and obligations of the parties are to be determined by the written contract itself, and they call upon us to decide the question from the record before us.

Upon further reflection, we have come to the conclusion that the contract, under a fair and legal interpretation, contemplates the refunding payment by plaintiff of the market value of the molasses in Cuba, at the date of the shipments, with the addition of the exchange then current

and necessary to make the purchase and shipment.

It is, we think, clear that defendants were to furnish the requisite funds, and were to be reimbursed out of the proceeds, and that, unless the contrary be shown, it was a cash transaction. It appears that the purchase had to be made with gold, and that, at the date of the purchase, the gold could be procured at 66 2-3 per cent. premium, and we must infer that they invested or disbursed for plaintiff's account at those figures, and are to be reimbursed at the same. They were careful to protect themselves against loss, while plaintiff took all the risk of the fluctuations in the market and currency. The contract does not say that the plaintiff should refund in gold or its equivalent at the end of the adventure, but simply the cost and charges, exchange and expenses *paid by defendants*, and their commissions. Had gold declined, he would still have to refund the sum advanced by defendants, made up of the cost at the place of shipment and the exchange then current. And had the adventure proved a total failure, he still, under the terms of the contract, would have to reimburse the same amount. C. C. 2991. He is, therefore, entitled to the advantages which may attend the risk.

To illustrate the principle : We find that, on one shipment, defendants paid, in Cuba, the sum of $11,650 08 in gold, and that, at that date, the premium on gold was 66 2-3 per cent., which would make the sum of $19,416 80, necessary to effect the payment in Cuba, and which sum should be reimbursed to them out of the proceeds, according to the contract, otherwise; they would themselves become the adventurers, and gain or lose, accordingly as the premium on gold would advance or decline, between the date of the shipment and that of the sale here ; which was not contemplated by the contract ; for they were under no contingency to suffer loss, and they cannot be said to sustain loss if they are reimbursed what they have advanced for account of plaintiff on the two shipments.

We think, from an examination of their accounts, in connection with the written contract and the admissions of parties, that the judgment of the lower Court has allowed such reimbursements, and placed a proper interpretation upon the contract in question.

It is therefore ordered that the judgment heretofore rendered by us be set aside ; and it is now ordered, adjudged and decreed, that the judgment of the lower Court be affirmed, with costs.